**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

TIO DINERO SESSOMS,
*Petitioner-Appellant*,

v.

RANDY GROUNDS, Warden,
*Respondent-Appellee*.

No. 08-17790

D.C. No.
2:05-cv-01221-JAM-GGH

ORDER AND
AMENDED OPINION

On Remand from the United States Supreme Court

Argued and Submitted En Banc
March 18, 2014—San Francisco, California

Filed September 22, 2014
Amended January 23, 2015

Before: Alex Kozinski, Chief Judge, and Mary M.
Schroeder, Barry G. Silverman, M. Margaret McKeown,[*]
Kim McLane Wardlaw, Raymond C. Fisher, Richard A.
Paez, Consuelo M. Callahan, Milan D. Smith, Jr., Sandra S.
Ikuta and Mary H. Murguia, Circuit Judges.

Order;
Opinion by Judge McKeown;
Dissent by Chief Judge Kozinski;

---

[*] Judge McKeown was drawn to replace Judge B. Fletcher following her death shortly after the initial en banc decision.

Dissent by Judge Callahan;
Dissent by Judge Murguia

## SUMMARY[**]

### Habeas Corpus

The en banc court amended a September 22, 2014, opinion filed on remand from the United States Supreme Court, and denied a petition for rehearing, in a 28 U.S.C. § 2254 habeas corpus case in which Tio Dinero Sessoms challenged his conviction of murder, robbery, and burglary.

The en banc court reversed the district court's judgment denying the habeas petition and remanded with instructions to grant a conditional writ directing the State of California to retry Sessoms within a reasonable time or release him.

The en banc court held that the California Court of Appeal's conclusion that Sessoms did not make an unequivocal or unambiguous request for an attorney as required under *Davis v. United States*, 512 U.S. 452 (1994), was an unreasonable application of Supreme Court precedent as it existed at the time of the Court of Appeal's determination.

The en banc court reconsidered the case in light of *Salinas v. Texas*, 133 S. Ct. 2174 (2013), which involved a noncustodial interrogation, and which suggests that *Davis*'s

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

requirement of an unambiguous invocation of a right to counsel applies to pre-*Miranda* statements. The en banc court observed that this case, in contrast, involves a custodial interrogation in which the defendant should have been informed of his rights before he could knowingly waive them, but nevertheless assumed that the clear invocation requirement of *Davis* applies to Sessoms. With this requirement clearly in mind, the en banc court held that, under the circumstances, a reasonable law enforcement officer would have understood Sessoms's statements as an unambiguous request for counsel, which should have cut off any further questioning under clear Supreme Court precedent.

The en banc court concluded that because Sessoms's confession likely substantially swayed the jury toward conviction, the constitutional error was not harmless.

Reluctantly dissenting, Chief Judge Kozinski wrote that what the court must decide is not what Sessoms meant or the officers understood, but whether it was unreasonable for the state courts to conclude that a reasonable officer would have been perplexed as to whether Sessoms was asking for an attorney.

Dissenting, Judge Callahan wrote separately to stress that she reads the Supreme Court's remand as precluding the majority's conclusion that Sessoms's comments were so unambiguous as to render the California Court of Appeal's opinion unreasonable.

Judge Murguia, joined by Chief Judge Kozinski and Judges Silverman, Callahan, and Ikuta, dissented. Judge Murguia could not say, under the deference mandated by the AEDPA, that it was objectively unreasonable for the

California Court of Appeal to hold that a police officer could have interpreted Sessoms's statement as merely a possible request for a lawyer, which would not require the officer to stop the interrogation.

## COUNSEL

Eric Weaver (argued), Albany, California, for Petitioner-Appellant.

Jeffrey Firestone (argued), Deputy Attorney General; Kamala D. Harris, Attorney General of California; Michael P. Farrell, Senior Assistant Attorney General; and Charles A. French, Supervising Deputy Attorney General, Sacramento, California, for Respondent-Appellee.

Peter C. Pfaffenroth, HL Rogers and Brian A. Fox, Sidley Austin LLP, Washington, D.C.; Mark E. Haddad and Douglas A. Axel, Sidley Austin LLP, Los Angeles, California; and David M. Porter, Office of the Federal Defender, Sacramento, California, for Amicus Curiae National Association of Criminal Defense Lawyers.

## ORDER

The opinion filed on September 22, 2014, is amended. The amended opinion is filed concurrently with this order.

With these amendments, the panel has voted to deny the petition for rehearing.

The petition for rehearing is **DENIED**. No further petitions for rehearing or rehearing en banc will be entertained.

## OPINION

Opinion by McKEOWN, Circuit Judge, joined by SCHROEDER, WARDLAW, FISHER, PAEZ and M. SMITH, Circuit Judges:

An American poet wrote more than 100 years ago: "When I see a bird that walks like a duck and swims like a duck and quacks like a duck, I call that bird a duck."[1] When a suspect says "give me a lawyer," that request walks, swims, and quacks like a duck. It is an unambiguous request for a lawyer, no matter how you slice it. The statement is

---

[1] This quotation is often attributed to James Witcomb Riley, an American poet. Max Cryer, *Who Said That First? The Curious Origins of Common Words and Phrases* 139 (2001); *see In re Fletcher*, 489 B.R. 224, 235 & n.36 (Bankr. N.D. Okla. 2013). It has also been attributed to Walter Reuther. Hugh Rawson and Margaret Miner, *The Oxford Dictionary of American Quotations* 237 (2006).

unequivocal—it is not a maybe or a perhaps—it is an invocation of the Fifth Amendment right to counsel.

In late 1999, a naive and relatively uneducated nineteen-year-old Tio Sessoms sat alone in an eight-by-ten foot interrogation room. Four days earlier, on the advice of his father, Sessoms had turned himself in to the police. Before doing so, Sessoms's father told his son: you must ask for a lawyer before talking to the police.

Sessoms followed his father's advice. When the two police detectives entered the interrogation room, Sessoms sat slouched in his chair. He looked up, and they exchanged brief pleasantries. Sessoms was unfailingly polite, even saying he was glad the detectives "had a safe flight." Forty seconds after the detectives entered the room, the following exchange occurred:

> Sessoms: There wouldn't be any possible way that I could have a—a lawyer present while we do this?
>
> Det. Woods: Well, uh, what I'll do is, um—
>
> Sessoms: Yeah, that's what my dad asked me to ask you guys . . . uh, give me a lawyer.[2]

---

[2] The transcript of the colloquy says "give me a lawyer," but, after comparing the transcript to the videotape, Detective Woods testified that Sessoms said "[g]et me a lawyer." This minor distinction is not material to our analysis.

Instead of immediately ceasing the interrogation, the detectives carried on, convinced Sessoms that his accomplices had already told them what had happened, and impressed upon Sessoms that the only way to tell his side of the story was to speak to the officers then and there, without an attorney. Only after talking with him, softening him up, and warning him about the various "risks" of speaking with counsel did the detectives read Sessoms his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966). Unsurprisingly, Sessoms agreed to talk and made incriminating statements.

Sessoms was convicted of murder, robbery, and burglary, and sentenced to life without the possibility of parole. We consider his habeas appeal under the "demanding but not insatiable" standard of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). The California Court of Appeal concluded that Sessoms's request was not an unequivocal or unambiguous request for an attorney as required under *Davis v. United States*, 512 U.S. 452 (1994). Because this conclusion was an unreasonable application of Supreme Court precedent as it existed at the time of the Court of Appeal's determination, we reverse the district court's denial of the petition for a writ of habeas corpus and remand with instructions to grant a conditional writ of habeas corpus with directions that the State retry Sessoms within a reasonable period or release him. *See* 28 U.S.C. § 2254(d)(1).

## BACKGROUND AND PROCEDURAL HISTORY

### I. THE INTERROGATION

On October 20, 1999, Sessoms and two others burglarized Edward Sheriff's home in Sacramento, California. During

the burglary, one of Sessoms's accomplices repeatedly stabbed Sheriff, resulting in Sheriff's death.

Sessoms then fled from California to Oklahoma. When he became aware that there was a warrant out for his arrest, and after having discussed the situation with his father, Sessoms surrendered to Oklahoma police on November 15, 1999. His father advised him to ask for a lawyer before talking to the police.

Two detectives, Woods and Keller, flew from California to Oklahoma to question Sessoms on November 20, 1999, at the county jail where he was being held. Sessoms was in custody for at least four days before he was interrogated.

Before the officers entered the interrogation room, Sessoms sat alone, and quietly said to himself, "I'm not a criminal . . . . They didn't tell me if I have a lawyer. I know I want to talk to my lawyer now."[3] When the detectives entered the room, the following exchange took place:

> Det. Woods:   . . . Tio, I'm Dick.
>
> Sessoms:      How you doing, all right. You already know me.
>
> Det. Woods:   You say—

---

[3] Sessoms's statements to himself were made prior to the detectives entering the room, and there is no evidence that the detectives heard these statements. We, therefore, do not rely on these statements as part of the context relevant to whether a reasonable law enforcement officer would have understood Sessoms's statements as unambiguous requests for counsel.

Det. Keller: Tio, Pat Keller.

Det. Woods: You say Tio or Theo?

Sessoms: It—my name is pronounced Tio because it's [S]panish.

Det. Woods: Tio. Okay.

Det. Keller: Why don't we swap corners here for a minute, you guys? Go ahead and sit here.

Sessoms: So glad you fellows had a safe flight.

Det. Woods: Huh?

Sessoms: I'm glad you fellows had a safe flight out here.

Det. Keller: So are we. Huh.

Det. Woods: Well, we want a safe one back too.

Sessoms: Oh, you know ([i]naudible).

Det. Woods: Yeah. Uh, we both, uh—both from, uh, Sacramento PD and, uh—

Sessoms: There wouldn't be any possible way that I could have

> a—a lawyer present while we
> do this?

Det. Woods:     Well, uh, what I'll do is, um—

Sessoms:        Yeah, that's what my dad
                asked me to ask you guys . . .
                uh, give me a lawyer.

Woods proceeded as though Sessoms had said nothing. Instead of ending the interrogation, Woods persuaded Sessoms that having a lawyer was a bad idea. Sessoms explained that he was concerned that some police officers "end up switching your words afterwards," to which Woods responded that he had no intention of playing any "switch games." Woods even produced a tape recorder to allay Sessoms's fears. As it turns out, the session was videotaped from the outset.

Woods then explained the situation: Sessoms and two accomplices were all being "charged with the same thing." Woods said he already knew "what happened" because the accomplices had waived their rights "and laid it out from A to Z." Woods reassured Sessoms that he believed that Sessoms "did not participate in the stabbing," but warned that if Sessoms didn't make a statement right then and there, Woods wasn't going to be able to "get his version of it" because "most all attorneys—in fact, all attorneys will—will sometimes or usually advise you not to make a statement." Woods said he didn't really "need [Sessoms's] statement to make [the] case" anyway because he "already [had] two and a half other complete statements," reiterating that he already "[knew] what happened" and had the hard evidence to back it up.

Only then—after telling Sessoms that having a lawyer would only hurt him and that invoking his right to counsel would be futile because the police already knew what had happened—did Woods read Sessoms his rights under *Miranda*. Sessoms hesitated, shrugged his shoulders, and said, "[l]et's talk," proceeding to implicate himself in the crime.

## II. PROCEEDINGS IN THE CALIFORNIA COURTS

Before trial, Sessoms moved to suppress the incriminating statements arguing that they were obtained in violation of *Miranda* because he had "clearly and unequivocally" invoked his right to counsel. The trial court denied the motion. Sessoms went to trial and was convicted of first-degree murder, robbery, and burglary, with the special circumstance that he was engaged in the commission or attempted commission of the crimes of robbery and burglary when the murder occurred. At the conclusion of the trial, Sessoms moved for a new trial "based upon prejudicial *Miranda* error," renewing the objections he had made in his pretrial motion. The trial court denied the motion. Sessoms was sentenced principally to life in prison without the possibility of parole.

Sessoms appealed to the California Court of Appeal, which determined that Sessoms's statements did not qualify as an invocation of the right to counsel under *Davis*, 512 U.S. 452.[4] It found that "although [Sessoms] twice explicitly referred to an attorney, neither statement was an unequivocal

---

[4] The California Court of Appeal's opinion is "the last reasoned opinion" in this matter for purposes of AEDPA. *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991); *see Barker v. Fleming*, 423 F.3d 1085, 1091 (9th Cir. 2005).

or unambiguous request for counsel." *People v. Sessoms*, No. C041139, 2004 WL 49720, at *3 (Cal. Ct. App. Jan. 12, 2004). According to the Court of Appeal, Sessoms's first statement was "legally indistinguishable" from the statements made in *Davis*, 512 U.S. at 455 ("Maybe I should talk to a lawyer") and *People v. Crittenden*, 9 Cal. App. 4th 83, 123–24 (1994) ("Did you say I could have a lawyer?"), which were not unequivocal requests for an attorney. *Id*. Sessoms's second statement, the court continued, was also not an unequivocal request for an attorney, but "[a]t best . . . a statement of his father's advice to him." *Id*. Ultimately, the Court of Appeal concluded that Sessoms's statements were not "sufficiently clear[] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." *Id.* (quoting *Davis*, 512 U.S. at 459) (alteration in original) (internal quotation marks omitted).

## III.   PROCEEDINGS IN THE FEDERAL COURTS

After exhausting his state court remedies, Sessoms filed a federal habeas petition, arguing primarily that he had invoked his right to counsel. A magistrate judge recommended denying the petition. The district court adopted the magistrate judge's findings and recommendations and denied the petition, but granted a certificate of appealability on the *Miranda* and ineffective assistance of counsel claims.[5]

---

[5] The ineffective assistance of counsel claim arose from counsel's "fail[ure] to investigate and present evidence that [Sessoms's] constitutional rights were violated by Sacramento Detectives Woods and Keller during his interrogation."

A divided three-judge panel of this court upheld the district court's denial of Sessoms's habeas petition. *Sessoms v. Runnels*, 650 F.3d 1276, 1283 (9th Cir. 2011). The majority held that "[b]ecause Sessoms's statements were made *prior* to his *Miranda* waiver, *Davis* cannot apply as 'clearly established Federal law' in this case." *Id.* at 1283. But the majority held that it was not unreasonable for the state court to require an unambiguous request for counsel and concluded that Sessoms's request was ambiguous. *Id.* at 1284–89.

We granted rehearing en banc. In an opinion authored by Judge B. Fletcher, the majority concluded that the state court's decision was an unreasonable application of clearly established federal law and reversed the district court's denial of habeas relief. *Sessoms v. Runnels*, 691 F.3d 1054, 1064 (9th Cir. 2012) (en banc), *cert. granted, judgment vacated sub nom. Grounds v. Sessoms*, 133 S. Ct. 2886 (2013). The majority reasoned that *Davis*'s requirement that a request for counsel be unambiguous applies only after a suspect has been informed of his *Miranda* rights, and thus granted a conditional writ of habeas corpus. *Id.* at 1060–63. The majority also noted that Sessoms "clearly expresse[d] his desire for an attorney." *Id.* at 1063.

The Supreme Court granted the state's petition for a writ of certiorari, vacated the decision, and remanded the case in light of *Salinas v. Texas*, 133 S. Ct. 2174 (2013). *Sessoms*, 133 S. Ct. 2886. Following supplemental briefing, the en banc panel heard oral argument. We now reconsider this case in light of *Salinas*, which suggests, contrary to the reasoning of the first en banc court, that *Davis*'s requirement of an unambiguous invocation of a right to counsel applies to pre-*Miranda* statements. Although *Salinas* points in that

direction, it involved a noncustodial interrogation. *Salinas*, 133 S.Ct. at 2183. Indeed, Justice Alito's plurality opinion stressed that the noncustodial nature of the interview placed the "petitioner's situation outside the scope of *Miranda*." *Id.* at 2180. This case, in contrast, involves a custodial interrogation in which the defendant should have been informed of his rights before he could knowingly waive them. *See Miranda*, 384 U.S. at 467–68. We nevertheless assume that the clear invocation requirement of *Davis* applies to Sessoms. With this requirement clearly in mind, we hold that, under the circumstances, a reasonable law enforcement officer would have understood Sessoms's statements as an unambiguous request for counsel, which should have cut off any further questioning under clear Supreme Court precedent.[6]

## ANALYSIS

### I. *MIRANDA* AND ITS PROGENY

Our analysis begins with the landmark case of *Miranda v. Arizona*, which established certain safeguards that must be afforded to suspects, including the right to have counsel present during a custodial interrogation. The Supreme Court refined its analysis of the *Miranda* right to counsel in a series of cases including, as relevant here, *Edwards v. Arizona*, 451 U.S. 477 (1981); *Smith v. Illinois*, 469 U.S. 91 (1984) (per curiam); *Davis*, 512 U.S. 452; *Berghuis v. Thompkins*, 560 U.S. 370 (2010); and, most recently, *Salinas*, 133 S. Ct. 2174.

---

[6] Because we conclude that Sessoms is entitled to relief on his *Miranda* claim, we do not address his ineffective assistance of counsel claim.

In *Miranda*, the Supreme Court established rules that law enforcement must follow to ensure certain "basic" and "precious" rights "enshrined in our Constitution." 384 U.S. at 442. These rights include the Fifth Amendment's guarantee that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. One of the Court's primary concerns in *Miranda* was the temptation for law enforcement officers, operating with little or no supervision over their investigative actions, to overbear the will of a defendant in an isolated custodial interrogation setting. 384 U.S. at 461, 466. The Fifth Amendment privilege "protect[s] persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves." *Id.* at 467.

The Court wrote that "[a]n understanding of the nature and setting of [an] in-custody interrogation is essential" to its decisions in *Miranda*. *Id.* at 445. Stressing that "the modern practice of in-custody interrogation is psychologically rather than physically oriented," *id.* at 448, the Court explained that "the very fact of custodial interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals." *Id.* at 455. "The Court in *Miranda* presumed that interrogation in certain custodial circumstances is inherently coercive and . . . that statements made under those circumstances are inadmissible unless the suspect is specifically warned of his *Miranda* rights and freely decides to forgo those rights." *Duckworth v. Eagan*, 492 U.S. 195, 202 (1989) (internal quotation marks omitted).

To ensure that the use of such psychological tactics to exploit a suspect's vulnerabilities do not run afoul of the Fifth Amendment, *Miranda* set a clear bright-line rule: "Prior to

any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney. . . ." *Id*. at 444. If a suspect "indicates in any manner and at any stage of the process that he wishes to consult with an attorney," all questioning must cease. *Id.* at 444–45. The Court presciently captured the importance of timing: "a warning at the time of the interrogation is indispensable to overcome its pressures and to ensure that the individual knows he is free to exercise the privilege at that point at time." *Id.* at 469. The Court underscored the importance of giving the *Miranda* warnings at the outset of an interrogation "to insure that what was proclaimed in the Constitution had not become but a form of words in the hands of government officials." *Id*. at 444 (internal citation and quotation marks omitted); *see Alvarez v. Gomez*, 185 F.3d 995, 997 (9th Cir. 1999) ("Under *Miranda*, a person in custody must be informed *before interrogation* that he has a right to remain silent and to have a lawyer present." (emphasis added)).

Fifteen years later, in *Edwards v. Arizona*, the Supreme Court reiterated the principle that the "assertion of the right to counsel [is] a significant event and that once exercised by the accused, 'the interrogation must cease until an attorney is present.'" 451 U.S. at 485 (quoting *Miranda*, 384 U.S. at 474). *Edwards* makes clear that *Miranda*'s protections endure from the moment of invocation until the time the suspect is provided with counsel. The Court simply "reconfirm[ed]" that a suspect, "having expressed his desire to deal with the police only through counsel," must not be "subject to further interrogation by the authorities until counsel has been made available to him." *Id.* at 484–85. Of particular relevance here, the *Edwards* rule is "designed to

prevent police from badgering a defendant into waiving his previously asserted *Miranda* rights," *Michigan v. Harvey*, 494 U.S. 344, 350 (1990), and to ensure that officers "will not take advantage of the mounting coercive pressures of prolonged police custody," *Maryland v. Shatzer*, 559 U.S. 98, 105 (2010) (internal quotation marks omitted); *see New York v. Quarles*, 467 U.S. 649, 654 (1984). Taken together, "[t]he purpose of the *Miranda–Edwards* guarantee" is to protect "the suspect's desire to deal with the police only through counsel." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991) (internal quotation marks omitted).

The Court applied the principles of *Miranda* and *Edwards* just three years later in *Smith*. Eighteen-year-old Smith was taken into custody for interrogation, and the officers immediately gave him the *Miranda* warnings. *Smith*, 469 U.S. at 92–93. In the course of advising Smith of his rights, the officers stated: "You have a right to consult with a lawyer and to have a lawyer present with you when you're being questioned. Do you understand that?" *Id.* at 93. Smith responded: "Uh, yeah. I'd like to do that." *Id.* (emphasis omitted). Rather than ceasing questioning, the officers pressed on:

> Q. Do you wish to talk to me at this time without a lawyer being present?
>
> A. Yeah and no, uh, I don't know what's what, really.
>
> Q. Well. You either have [to agree] to talk to me this time without a lawyer being present and if you do agree to talk with

> me without a lawyer being present you
> can stop at any time you want to.
>
> Q.  All right. I'll talk to you then.

*Id.* Smith proceeded to make incriminating statements. *Id.*

The Court reasoned that the Illinois Supreme Court erred "by looking to Smith's *subsequent* responses to continued police questioning"—namely, his statements that he didn't "know what's what, really"—to inform its holding that Smith's initial requests for counsel were ambiguous. *Id.* at 97. Questioning should have ceased after the first request for counsel, which the officers ignored, because the statement—"Uh, yeah, I'd like to do that"—"was neither indecisive nor ambiguous." *Id.* The Court emphasized that the *Edwards* "bright-line rule that all questioning must cease after an accused requests counsel" intends to prevent "the authorities through badger[ing] or overreaching—explicit or subtle, deliberate or unintentional—[from] otherwise wear[ing] down the accused and persuad[ing] him to incriminate himself notwithstanding his earlier request for counsel's assistance." *Id.* at 98.

The Supreme Court revisited the scope of *Miranda* and *Edwards* in *Davis*. During a custodial interview with the Naval Investigative Service, Davis executed a written waiver of his rights and expressly agreed to speak to law enforcement. *Davis*, 512 U.S. at 454–55. Only after being questioned for ninety minutes did Davis utter the words "[m]aybe I should talk to a lawyer." *Id.* at 455. Mirroring its teachings in *Miranda* and *Edwards*, the Court reaffirmed the fundamental principle that "if a suspect requests counsel at any time during [a custodial] interview, he is not [to be]

subject to further questioning until a lawyer has been made available or the suspect himself reinitiates conversation." *Id.* at 458 (citing *Edwards*, 451 U.S. at 484–85).

The Court went on to clarify, however, that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." *Id.* at 459. "[T]he suspect must unambiguously request counsel." *Id.* The Court explained the reasoning behind this requirement as follows:

> A suspect who knowingly and voluntarily waives his right to counsel *after having that right explained to him* has indicated his willingness to deal with the police unassisted. Although *Edwards* provides an additional protection—if a suspect subsequently requests an attorney, questioning must cease—it is one that must be affirmatively invoked by the suspect.

*Id.* at 460–61 (emphasis added). The statement, "[m]aybe I should talk to a lawyer," was not an unambiguous or unequivocal request for counsel in light of Davis's prior waiver of that same right. *Id.* at 462.

More recently, in *Berghuis* and *Salinas*, the Court considered the significance of silence in the *Miranda* context. In *Berghuis*, after being informed of his *Miranda* rights, the suspect refused to sign a waiver form and simply remained silent through almost three hours of interrogation before making an incriminating statement. *See* 560 U.S. at 374–76.

In concluding that the suspect never invoked his right to silence, the Court echoed its holding in *Davis* that an invocation of the right to remain silent, like the right to counsel, must be unambiguous. *Id.* at 381–82. The Court wrote, not without significance, that it need not "add marginally" to *Miranda*'s prophylactic protections by "[t]reating an ambiguous . . . statement as an invocation of *Miranda* rights," because "full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process." *Id.* at 382. (citations omitted). This conclusion mirrored the determination in *Davis* that the "primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves" and that, "*after* having [those] right[s] explained to him," a suspect must invoke his rights "affirmatively." 512 U.S. at 460–61 (emphasis added).

Just last year, in *Salinas*, the Court reiterated that although "no ritualistic formula is necessary in order to invoke the privilege," to "simply stand[] mute," as Salinas did, was insufficient. 133 S. Ct. at 2178 (quoting *Quinn v. United States*, 349 U.S. 155, 164 (1955)). In a noncustodial, voluntary interview, Salinas answered most of the officer's questions, but when lobbed a linchpin question—"whether his shotgun 'would match the shells recovered at the scene'"—he went silent. *Id.* Instead of answering, he "[l]ooked down at the floor, shuffled his feet, bit his bottom lip, cl[e]nched his hands in his lap, [and] began to tighten up." *Id.* at 2178 (alterations in original) (internal quotation marks omitted). After a few moments of silence, he started answering questions again. *Id.* Salinas had not unambiguously invoked his right to remain silent because "[i]f the extended custodial silence in [*Berghuis*] did not invoke the privilege, then surely

the momentary silence in [*Salinas*] did not do so either." *Id.* at 2182.

In *Salinas*, the Court first noted that a witness "must claim [the privilege against self-incrimination] at the time he relies on it." *Id.* at 2179 (internal quotation marks omitted). This ruling came against the backdrop of *Edwards*, *Smith*, *Davis* and *Berghuis*, which establish that, under the circumstances of the interrogation, the invocation must be clear and unambiguous.

The results in *Berghuis* and *Salinas* are no surprise—mere silence does not qualify as an invocation of the right to remain silent. The discussion of the Fifth Amendment in *Salinas* is instructive, however, to the resolution of the right to counsel issue in this case. *See Berghuis*, 560 U.S. at 381 ("[T]here is no principled reason to adopt different standards for determining when an accused has invoked the *Miranda* right to remain silent and the *Miranda* right to counsel . . . ."). In *Salinas*, the Court reaffirmed the importance of the *Miranda* warnings and discussed the two well-recognized exceptions to this rule. 133 S. Ct. at 2179. The first is that a witness "need not take the stand and assert the privilege at his own trial." *Id.* (citing *Griffin v. California*, 380 U.S. 609, 613–615 (1965)). That exception was not at issue in *Salinas* and is not at issue here. *See id.* at 2179–80. Nor did the second exception—the presence of "governmental coercion [rendering] his forfeiture of the privilege involuntary"—apply to Salinas. *Id.* at 2180. Sessoms did not claim this exception in the state court proceedings. Accordingly, we do not rest our analysis on either exception to the Fifth Amendment privilege.

We now consider Sessoms's claim in light of the teachings of *Miranda* and its progeny. Viewing the totality of the circumstances of the interrogation, we conclude that not only did Sessoms claim the privilege twice before being suitably warned, he did so unequivocally.

## II. THE STATE COURT'S UNREASONABLE APPLICATION OF SUPREME COURT PRECEDENT

This case involves an "unreasonable application" of clearly established federal law, which we review under AEDPA's deferential standard of review. *See* 28 U.S.C. § 2254(d); *Williams v. Taylor*, 529 U.S. 362, 407 (2000) (holding that under AEDPA, "a state-court decision involves an unreasonable application of this Court's precedent if the state court identifies the correct governing legal rule from this Court's cases but unreasonably applies it to the facts of the particular state prisoner's case."). We take no issue with the California Court of Appeal's fact-finding or with its identification of the governing Supreme Court precedents, *Miranda*, *Edwards*, and *Davis*.

The court fell short, however, in its application of those precedents to the undisputed facts. It unreasonably applied those precedents by analyzing Sessoms's statements in isolation rather than collectively and in context to conclude that "although [Sessoms] twice explicitly referred to an attorney, neither statement was an unequivocal or unambiguous request for counsel." *Sessoms*, 2004 WL 49720, at *3; *see also Anderson v. Terhune*, 516 F.3d 781, 791 (9th Cir. 2008) (en banc) (setting out the framework under AEDPA, 28 U.S.C. § 2254(d)(1), and holding that "[t]he state court's decision to ignore an unambiguous declaration of the right to remain silent is an unreasonable

application of *Miranda*").[7]  The court reasoned that the first statement—"There wouldn't be any possible way that I could have a . . . lawyer present while we do this?"—was a question that was "legally indistinguishable from the equivocal remarks in *Davis*."    It characterized the second statement—"give me a lawyer"—as a statement of his father's advice.  It never considered the two statements together and in context.  Our decision rests on clearly established Supreme Court precedent and requires no extension of the rationale of the invocation of counsel cases. *See White v. Woodall*, 134 S. Ct. 1697, 1706 (2014).

We begin with the circumstances leading up to Sessoms's statements regarding counsel.  *See Smith*, 469 U.S. at 98 ("Where nothing about the request for counsel or the circumstances leading up to the request would render it ambiguous, all questioning must cease.").  The interrogators in this case employed many of the tactics against which *Miranda* warned.  No warning came up front.  The detectives plunged right into their questioning, which counsel for the state acknowledged at oral argument was a custodial interrogation.  What was missing, nearly forty years after *Miranda*, was the now well-known *Miranda* warnings.

*Miranda* recognized that overzealous police practices during custodial interrogation create the potential for compulsion in violation of the Fifth Amendment.  *Id.* at 455–58.  Indeed, "[a]n individual [like Sessoms] swept from

---

[7] We cite circuit precedent to outline the standard at issue, but recognize that a circuit court "may not consul[t] its own precedents, rather than those of th[e] [Supreme] Court, in assessing a habeas claim governed by 28 U.S.C. § 2254."  *White v. Woodall*, 134 S. Ct. 1697, 1702 n.2 (2014) (first alteration in original) (internal quotation marks omitted).

familiar surroundings into police custody, surrounded by antagonistic forces, and subjected to the techniques of persuasion . . . cannot be otherwise than under compulsion to speak." *Id*. at 461. *Davis* reminded that "the primary protection afforded suspects subject to custodial interrogation is the *Miranda* warnings themselves." 512 U.S. at 460. And *Salinas* warned against the "inherently compelling pressures of an unwarned custodial interrogation." 133 S. Ct. at 2180 (internal quotation marks omitted). Even without receiving any *Miranda* warning, Sessoms overcame these pressures and requested counsel unequivocally.

The interrogation started out politely, with Sessoms saying that he was glad the detectives had a safe flight from California. In keeping with the pleasant small talk Sessoms made with the detectives when they entered the interrogation room, and before receiving any advice regarding counsel, Sessoms politely asked: "There wouldn't be any possible way that I could have a—a lawyer present while we do this?" Unlike *Davis*, where the defendant asked, "[m]aybe I should talk to a lawyer?," Sessoms was not asking whether he *should* speak to a lawyer. Like the defendant in *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005), who asked, "[c]an I have a lawyer?"—which the Seventh Circuit recognized as an unequivocal request for counsel—Sessoms was deferentially asking whether he *could* have a lawyer. *See United States v. Hunter*, 708 F.3d 938, 948 (7th Cir. 2013) (holding that "[c]an you call my attorney?" was an unequivocal request for counsel).

The detectives understood that Sessoms was requesting counsel, as Woods's response to a subsequent question illustrates. After requesting counsel and before receiving the *Miranda* warnings, Sessoms paralleled the phrasing of his

first request for counsel asking, in response to Woods's question about whether Sessoms wanted to talk, "[w]ould it be a possible chance that I can call my dad . . . ask him?" The officers understood that statement as an expression of Sessoms's desire to speak to his father and responded accordingly: "Well no, because . . . [y]ou're an adult." There was no ambiguity in the first request for counsel—Sessoms was expressing his desire to speak to an attorney—any more than there was ambiguity in Sessoms's request to speak to his father.

The answer to "[t]here wouldn't be any possible way that I could have a . . . lawyer present while we do this?" was easy—"yes, you have the right to remain silent and you have the right to a lawyer even if you can't afford one." But the detectives did not respond that they could not decide for him whether he should speak to a lawyer, they did not follow up about whether he was asking for a lawyer as the officers in *Davis* did, nor did they answer his question. The detectives instead pretended that Sessoms had never raised the issue of a lawyer in the first place.

Ignoring the defendant's request flies in the face of clear Supreme Court precedent: "No authority, and no logic, permits the interrogator to proceed . . . on his own terms and as if the defendant had requested nothing, in the hope that the defendant might be induced to say something casting retrospective doubt on his initial statement that he wished to speak through an attorney or not at all." *Smith*, 469 U.S. at 99 (omission in original) (quotation marks and citation omitted). Under clearly established federal law, the answer to Sessoms's question about whether there could be a lawyer present during the interrogation should have been "yes," followed by a reading of the *Miranda* rights, and an end to

any questioning absent an affirmative waiver.  *See Edwards*, 451 U.S. at 485; *see also Duckworth*, 492 U.S. at 204 ("If the police cannot provide appointed counsel, *Miranda* requires only that the police not question a suspect unless he waives his right to counsel.").

Persisting in his attempts to speak with counsel before speaking to the officers, Sessoms repeated what he gleaned from his father: "give me a lawyer."  This was a very clear statement that Sessoms wanted counsel, yet the California Court of Appeal viewed this statement as a "statement of his father's advice to him."  Sessoms was not simply conveying his father's advice.  Why would he?  He was stating the fact that his father had told him to request counsel and that he was following through.  That his father instructed him to ask for counsel does not dilute the clarity of Sessoms's request; it simply means that Sessoms's father gave him good advice, and he took it.

The only reasonable interpretation of "give me a lawyer" is that Sessoms was asking for a lawyer.  What more was Sessoms required to say?  Was he obligated to repeat the obvious—"give me a lawyer"—another time?  It is no more reasonable to demand grammatical precision from a suspect in custody than it is to strip the officers of all common sense and understanding.  To the extent the first statement spawned any uncertainty—and we believe that it did not reasonably do so—taken together the two requests leave no doubt about what Sessoms wanted: a lawyer.

In light of clear Supreme Court precedent, we have recognized the importance of evaluating a suspect's in-custody statements as a whole.  *See Hunter*, 708 F.3d at 945–46 (explaining that *Smith* "confirms that courts should

only consider prior context when determining whether a defendant unambiguously invoked his right to counsel" and collecting cases in which the court "looked to prior context when determining whether a defendant unambiguously invoked his right to counsel"). The importance of *Smith* and context was illustrated in *Anderson v. Terhune*, where the suspect said "I don't even wanna talk about this no more"; "Uh! I'm through with this. I'm through. I wanna be taken into custody . . . ."; and, finally, "I plead the [F]ifth." 516 F.3d at 785–88. Citing to Supreme Court precedent in *Smith*, we held that "the state court was unreasonable in concluding that the invocation was ambiguous in context because the context, in fact, ma[de] it clear that Anderson wanted to end the interrogation in all respects." *Id.* at 788.

Viewed in the context of Sessoms's prior request that the detectives make counsel available to him during the interrogation, it was unreasonable to hold that Sessoms's second statement, "give me a lawyer," was an ambiguous request for counsel. What else could this mean? I don't want an attorney? I'm not sure I want an attorney? My dad wants an attorney? No, it means what it says in plain English: dad told me to ask you and I am—"give me an attorney."

As the Supreme Court has recognized, requests for counsel are to be "understood *as ordinary people* would understand them." *Connecticut v. Barrett*, 479 U.S. 523, 529 (1987) (emphasis added). The state court stretched the boundaries of how reasonable law enforcement officers would have understood Sessoms's statements in reaching its conclusion. Judge Murguia's dissent does the same. It recognizes that the Court of Appeal erred in its *Davis* analysis by considering Sessoms's statements in isolation. It then goes on to acknowledge that "the majority may offer the most

logical interpretation of what Sessoms was attempting to communicate by his statements." But then it jettisons the only "logical interpretation" of Sessoms's statements and embraces interpretations that blink reality—"Sessoms was merely expressing his father's opinion," "agreeing with his father," or stating that "he might" want an attorney—offering only that his statements contain "just enough ambiguity" to deny relief. Conjuring up ambiguity where there is none violates *Davis*. Construing the demand, "give me a lawyer," as ambiguous strains credulity. Invoking the mantra of "a fairminded jurist," a standard we embrace, does not mean that in evaluating the statements we toss overboard logic, common sense, and context. In contravention of *Davis*, by allowing the detectives to play games with Sessoms's clear language, the California Court of Appeal imposed the unreasonable grammatical precision of an "Oxford don" on a suspect subject to custodial interrogation. *See* 512 U.S. at 459 (quoting *id.* at 476 (Souter, J., concurring)).

What happened after Sessoms made these two statements illustrates precisely why, once a lawyer is requested, questioning must stop. It is also a testament to why *Miranda* warnings are required at the outset of custodial interrogation. Interrogation does not begin once the officers get to the hard questions. *Miranda* warnings are required before any interrogation begins.

Instead of giving *Miranda* warnings at the outset, or saying "yes" when Sessoms asked whether he could have a lawyer, Woods persisted with his questioning. He told Sessoms that they already knew what happened and that Sessoms's accomplices had confessed "la[ying] it out from A to Z," thereby "display[ing] an air of confidence in [Sessoms's] guilt" and appearing only to be "interest[ed] in

confirming certain details." *See Miranda*, 384 U.S. at 450. Woods offered Sessoms a "legal excuse[]," *see id.* at 451–52, and assured him that he believed that Sessoms did not participate in the stabbing. But then Woods immediately reversed course, telling Sessoms that he didn't really need his statement to make the case against him anyway, because Sessoms's accomplices had talked and hard evidence backed up their statements, thereby placing Sessoms "in a psychological state where his story [was] but an elaboration of what the police purport[ed] to know already—that he [was] guilty." *Id.* at 450. Eventually, the detectives, much as *Miranda* warns, overwhelmed Sessoms and persuaded him "out of exercising his constitutional rights." *Id.* at 455. Giving Sessoms the *Miranda* warnings, "in the midst of coordinated and continuing interrogation," was "likely to mislead and depriv[e] [him] of knowledge essential to his ability to understand the nature of his rights and the consequences of abandoning them." *See Missouri v. Seibert*, 542 U.S. 600, 613–14 (2004) (first alteration in original) (internal quotation marks omitted).

The detectives' behavior confirms that—like any reasonable law enforcement officers—they understood that Sessoms was requesting counsel. Woods's response to Sessoms's requests for counsel was to explain that he and Keller would be "up front" and "honest" with Sessoms and would not play any "switch games" with him. Woods backed up this promise with a tape recorder he had with him, which he said provided "proof that we ain't playing no switch games." It was not until after the detectives explained just how forthright they were being and reiterated that the existence of a recording would ensure that they "can't play no switch games" that they acknowledged Sessoms's requests for counsel, stating "Uh, I want to back up to your question

about an attorney" and explaining that first, they would advise Sessoms why they were interviewing him; then, they would advise Sessoms of his rights; and after all that, they would leave it to Sessoms "to decide if you want the attorney or not." After a bit more small talk, Woods drove the point home:

> [I]f you said you didn't want to make any statement without an attorney, we're not really going to be able to talk to you and get your version of it. Uh, most all attorneys—in fact, all attorneys will—will sometimes or usually advise you not to make a statement. But—and—and we don't need to have your statement to make this case because we've already got two and a half other complete statements. And we know what happened . . . .

Why would Woods need to talk Sessoms out of an attorney if he hadn't understood that Sessoms wanted an attorney?

In determining that Sessoms's statements are unlike the wavering statement in *Davis*, we hew to the teachings of *Salinas* that invocation of *Miranda* rights must be "express." *See* 133 S. Ct. at 2179. There was no ambiguity regarding what Sessoms wanted: a lawyer. It was not until Woods convinced Sessoms that a lawyer would simply get in the way that Sessoms relented and gave Woods what he wanted: incriminating statements made without the benefit of counsel.

Context and circumstances matter. Under *Davis* and *Smith*, the Court of Appeal was bound to analyze whether a reasonable officer viewing the situation in light of all of the

circumstances leading up to the statements would have understood Sessoms's statements to be a request for counsel. Rather than following that procedure, the California Court of Appeal analyzed each statement separately, did not explore the context in which the statements were made, and, unsurprisingly, landed on an unreasonable application of clearly established federal law. *See Sessoms*, 2004 WL 49720, at \*3. The Court of Appeal unreasonably applied clearly established precedent under *Miranda*, *Edwards*, *Smith*, and *Davis* when it held that Sessoms's request for counsel was ambiguous.

## III.  THE CONSTITUTIONAL ERROR WAS NOT HARMLESS

Harmless error review applies to the introduction of Sessoms's illegally obtained confession. *Arizona v. Fulminante*, 499 U.S. 279, 295 (1991). Reversal is required if the constitutional error "had substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted). We conduct this inquiry de novo. "If, reviewing the facts as a whole, we are able to determine with fair assurance that the judgment was not substantially swayed by the error, we may conclude that the error was harmless. Otherwise, we must conclude that the petitioner's rights were substantially and injuriously affected." *Hurd v. Terhune*, 619 F.3d 1080, 1090 (9th Cir. 2010); *see also Deck v. Jenkins*, 768 F.3d 1015, 1022 (9th Cir. 2014) ("If the record is so evenly balanced that a 'conscientious judge is in grave doubt as to the harmlessness of an error,' the petitioner must prevail.") (quoting *O'Neal v. McAninch*, 513 U.S. 432, 437 (1995)).

Accordingly, the question is whether we can fairly determine that Sessoms's confession did not substantially sway the jury to convict him for felony murder, burglary, and robbery.**8**   Applying this standard, we have little difficulty concluding that the admission of Sessoms's illegally obtained confession was not harmless.

To begin, as the Supreme Court has emphasized, a "defendant's own confession is probably the most probative and damaging evidence that can be admitted against him." *Fulminante*, 499 U.S. at 296 (citation omitted); *Alvarez v. Gomez*, 185 F.3d 995, 999 (9th Cir. 1995) (holding introduction of illegally obtained confession was not harmless error under *Brecht* standard).

This case underscores that point.  In his statements to police, Sessoms readily implicated himself in the crime, admitting that he knew about the planned robbery beforehand and was an active participant in carrying it out.  Critically, Sessoms confessed that he entered the house along with his two co-conspirators, expecting to rob the victim while he wasn't home.  He described the crime in vivid detail, down to the pajamas the victim was wearing when Sessoms and his cohorts stumbled upon him.

In closing arguments, prosecutors drove home the point, returning to Sessoms's confession again and again and telling jurors it was "very important evidence."  The prosecutor added, "You should consider it carefully.  He admits in his statements to the detectives his full and knowing involvement

---

**8**   The state acknowledges that, with respect to the jury's special circumstances verdict, the introduction of Sessoms's confession was not harmless.

in the underlying crimes of burglary and robbery. . . ." He went on to argue: "You should not question that what Mr. Sessoms said about his involvement and what happened that night is true."

The other evidence against Sessoms pales in comparison. Two teenage witnesses placed Sessoms near the scene on the night of the murder, but neither saw him enter the house. Eight days after the crime, police recovered Sessoms's fingerprints on documents inside the glove box of the victim's car. This circumstantial evidence may have supported an accessory charge, but it provided, at best, limited proof that Sessoms actually participated in the botched robbery, much less that he had the specific intent necessary for the felony murder, robbery, and burglary convictions.

Sessoms's confession was the linchpin of the prosecution's case. Because the confession likely substantially swayed the jury toward conviction, the constitutional error was not harmless.

## CONCLUSION

Sessoms's statements, taken together, are a far cry from the ambiguous statement offered in *Davis* and the unclear conduct in *Berghuis* and *Salinas*. *Davis* recognized that "a suspect need not speak with the discrimination of an Oxford don," however, "he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." 512 U.S. at 459 (quoting *id.* at 476 (Souter, J., concurring)) (internal quotation marks omitted). This is precisely what Sessoms did. Admission of Sessoms's

statements was not harmless error. We reverse the district
court's judgment and remand for further proceedings
consistent with this opinion.

**REVERSED AND REMANDED.**

Chief Judge KOZINSKI, reluctantly dissenting:

This is a sad and troubling case. There can be no doubt
that Tio Sessoms meant to ask for a lawyer. Nor is there any
doubt that detectives Woods and Keller understood exactly
what he was asking for—and used their hefty leverage to
divert him from that purpose. It was hardly a fair contest: a
boy in his teens, held in custody and cut off from friends and
family, pitted against two police detectives with decades of
experience in overcoming the will of recalcitrant suspects and
witnesses.

But what we must decide is not what Sessoms meant or
the officers understood, but whether it was unreasonable for
the state courts to conclude that a reasonable officer would
have been perplexed as to whether Sessoms was asking for an
attorney. This is the kind of question only lawyers could
love—or even understand—and perhaps not even most of
them. I am dismayed that Sessoms's fate—whether he will
spend his remaining days in prison, half a century or more
caged like an animal—turns on such esoterica. But that's the
standard we are bound to apply, even if we are convinced that
the habeas petitioner's constitutional rights were violated.
*See Cavazos* v. *Smith*, 132 S. Ct. 2, 4 (2011) (per curiam)
("[T]he inevitable consequence of [AEDPA] is that [federal]
judges will sometimes encounter convictions that they believe

to be mistaken, but that they must nonetheless uphold."); *see also Brown* v. *Payton*, 544 U.S. 133, 148–49 (2005) (Breyer, J., concurring) (stating that even though he likely would have found a constitutional violation "[w]ere [he] a California state judge," the state court's denial of habeas relief was reasonable).

Under this unforgiving standard, Judge Murguia has the better of the argument. This is not a case where the state judges were confused about the law or overlooked key evidence, as in *Taylor* v. *Maddox*, 366 F.3d 992, 1008 (9th Cir. 2004). No, the Court of Appeal's opinion is carefully crafted to exploit every ambiguity in the timid utterances of a scared and lonely teenager. Another uneven contest that Sessoms was bound to lose.

While I agree with Judge Murguia's analysis and join her dissent, it's just as well that our view doesn't command a majority. If the State of California can't convict and sentence Sessoms without sharp police tactics, it doesn't deserve to keep him behind bars for the rest of his life. I have seen far too many cases where police extract inculpatory statements from suspects they believe to be guilty, then stop looking for evidence, confident that the courts will uphold the interrogation, no matter how tainted. *See, e.g.*, *Milke* v. *Ryan*, 711 F.3d 998, 1001–02 (9th Cir. 2013); *Taylor*, 366 F.3d at 996–97. This can lead to wrongful convictions, as innocent interrogation subjects confess with surprising frequency. *See* Saul M. Kassin et al., *Police-Induced Confessions: Risk Factors and Recommendations*, 34 Law & Hum. Behav. 3, 3–5 (2009); Brandon L. Garrett, *Judging Innocence*, 108 Colum. L. Rev. 55, 88–89 (2008). When courts bend over backwards to salvage evidence extracted by questionable methods, they encourage police to take such shortcuts rather

than doing the arduous legwork required to obtain hard evidence.

The state courts should have been far more vigilant in correcting and condemning the detectives' improper conduct, particularly since it involved a naïve teenager who clearly tried very hard to invoke his constitutional right to have a lawyer present during questioning. The state courts having failed Sessoms, I'm glad that a majority of our en banc court is able to conclude that the state courts were unreasonable. I hope their view prevails in the end.

CALLAHAN, Circuit Judge, dissenting:

This case is before our en banc panel for a second time after the Supreme Court vacated our prior opinion and remanded for further consideration in light of *Salinas v. Texas*, 133 S. Ct. 2174 (2013). I concur in Judge Murguia's dissent. I write separately to stress that I read the Supreme Court's remand for further consideration in light of *Salinas* as precluding the majority's conclusion that Sessoms's comments were so unambiguous as to render the California Court of Appeal's opinion unreasonable.

Although *Salinas* concerned the right to remain silent rather than the right to counsel, Justice Alito's plurality opinion in *Salinas* sets forth a controlling perspective.[1] He

---

[1] Sessoms's claim would clearly fail under Justice Thomas's concurring opinion, which Justice Scalia joined. Justice Thomas wrote: "In my view, Salinas' claim would fail even if he had invoked the privilege because the

first reiterated that "[t]he privilege against self-incrimination 'is an exception to the general principle that the Government has the right to everyone's testimony.'" 133 S. Ct. at 2179 (quoting *Garner v. United States*, 424 U.S. 648, 658 n.11). He explained that the requirement that the privilege be clearly invoked:

> ensures that the Government is put on notice when a witness intends to rely on the privilege so that it may either argue that the testimony sought could not be self-incriminating, *see Hoffman v. United States*, 341 U.S. 479, 486, 71 S. Ct. 814, 95 L. Ed. 1118 (1951), or cure any potential self-incrimination through a grant of immunity, *see Kastigar v. United States*, 406 U.S. 441, 448, 92 S. Ct. 1653, 32 L. Ed.2d 212 (1972).

133 S. Ct. at 2179. Justice Alito further elaborated that "[a] witness' constitutional right to refuse to answer questions depends on his reasons for doing so, and courts need to know those reasons to evaluate the merits of a Fifth Amendment claim."[2] *Id*. at 2183.

---

prosecutor's comments regarding his precustodial silence did not compel him to give self-incriminating testimony." 133 S. Ct. at 2184.

[2] Justice Alito added the following footnote:

> The dissent suggests that officials in this case had no "special need to know whether the defendant sought to rely on the protections of the Fifth Amendment." Post, at 2186–2187 (opinion of BREYER, J.). But we have never said that the government must demonstrate such a need on a case-by-case basis for the invocation

The application of this perspective to Sessoms's situation precludes a finding that the California Court of Appeal's decision was "based on an unreasonable application of, clearly established Federal law."  28 U.S.C. § 2254(d)(1).

The opinions in *Salinas* confirm that the Supreme Court had not previously ruled on the degree of certainty required for a pre-*Miranda* request for counsel.  Justice Alito saw Salinas's unexplained silence in response to the prosecutor's question as ambiguous.  He does not deny that Salinas could have asserted his right against self-incrimination under the Fifth Amendment as his reason for declining to answer.  Nor does he deny that if Salinas had invoked his rights under the Fifth Amendment, the prosecutor would have been barred at trial from commenting on Salinas's silence.

The logic behind the determination that Salinas's silence was ambiguous leads to the conclusion that Sessoms's comments concerning counsel were also ambiguous.  In both instances the defendants were at police stations.  Although Salinas may not have been "in custody," Sessoms had voluntarily placed himself in custody.  In both instances, the officers had legitimate reasons for needing specificity.  In *Salinas*, as noted, the officers could have considered grants of immunity.  Similarly, with Sessoms, the officers might have considered grants of immunity and definitely needed to know

> requirement to apply. Any such rule would require judicial hypothesizing about the probable strategic choices of prosecutors, who often use immunity to compel testimony from witnesses who invoke the Fifth Amendment.

133 S. Ct. at 2183 n.4.  The majority appears to succumb to "judicial hypothesizing."

whether under *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Edwards v. Arizona*, 451 U.S. 477 (1981), they were required to cease the interrogation even before they gave a *Miranda* warning.

As a practical matter, Salinas's reason for not answering the officer's question was more obvious than Sessoms's intent. The officer asked Salinas whether his shotgun would match the shells recovered at the scene of the murder. *Salinas*, 133 S. Ct. at 2178. It is hard to imagine a question that more obviously calls for an incriminating answer. In contrast, as Judge Murguia's dissent notes, Sessoms's statements are in themselves ambiguous.**[3]** In light of the case law cited by Judge Murguia, the California Court of Appeal's decision that Sessoms' statements were ambiguous cannot be considered "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

The majority, perhaps seeking to avoid this conclusion, purports to grant relief on the first prong of § 2254(d), holding that the California Court of Appeal "landed on an unreasonable application of clearly established federal law." Maj. Op. at 30–31. The State court's alleged failings were that it "analyzed each statement separately, [and] did not explore the context in which the statements were made." *Id*.

---

**[3]** It might further be noted that as a practical matter, a suspect may, on occasion, benefit from waiving his *Miranda* rights in exchange for immunity or a bargained sentence. This reality supports the requirement that a request for counsel be unambiguous because a defendant may mention his Fifth Amendment rights as a negotiating tactic.

The California Court of Appeal's decision, however, speaks for itself.  The court wrote:

> " '[A] statement either is such an assertion of the right to counsel or it is not.' [Citation.] Although a suspect need not 'speak with the discrimination of an Oxford don,' [citation], he must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney.  If the statement fails to meet the requisite level of clarity, *Edwards* does not require that the officers stop questioning the suspect.  [Citation.]" (*Davis, supra*, 512 U.S. at p. 459.)

> In the present case, although defendant twice explicitly referred to an attorney, neither statement was an unequivocal or unambiguous request for counsel.  On the first occasion, defendant asked, "There wouldn't be any possible way that I could have a . . . lawyer present while we do this?"  As the court found, this was a question, not an unambiguous request.  Defendant's second reference to an attorney was "Yeah, that's what my dad asked me to ask you guys . . . uh, give me a lawyer."

> We find defendant's first statement is legally indistinguishable from the equivocal remarks in *Davis*, "'Maybe I should talk to a lawyer'" (*Davis, supra*, 512 U.S. at p. 455), and in

> *People v. Crittenden* (1994) 9 Cal.4th 83, 123 (*Crittenden*), "'Did you say I could have a lawyer?'" These equivocal remarks in *Davis* and *Crittenden* were not requests for counsel triggering the *Edwards* rule. (*Davis, supra*, 512 U.S. at p. 462.) Similarly, "[i]n the present case, defendant did not unequivocally state that he wanted an attorney, but simply asked a question." (*Crittenden, supra*, 9 Cal.4th at p. 130.)
>
> Nor was defendant's second reference to an attorney an unequivocal request for an attorney. At best, it was a statement of his father's advice to him. We cannot find such a statement to be "sufficiently clear[ ] that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney." (*Davis*, *supra*, 512 U.S. at p. 459.)

*People v. Sessoms*, No. C041139, 2004 WL 49720 at *3 (Ca. Ct. App. Jan. 12, 2004) (citations as set forth in the original).

Indeed, the majority opinion appears to reflect a disagreement with the California Court of Appeal's view of the facts, not its application of clear Federal law.[4] The

---

[4] The majority's distinction between a determination of fact and the application of clearly established Federal law is less than clear. It notes that the California Court of Appeal identified "the governing Supreme Court precedents, *Miranda*, *Edwards* and *Davis*," but then opines that the court "unreasonably applied those precedents by analyzing Sessoms's statements in isolation rather than collectively and in context." Maj. Op. at 22. This suggests that where, as here, the underlying facts are not

opinion states: "[t]he only reasonable interpretation of 'give me a lawyer' is that Sessoms was asking for a lawyer," Maj. Op. at 26; "[v]iewed in the context of Sessoms's prior request that the detectives make counsel available to him during the interrogation, it was unreasonable to hold that Sessoms's second statement, 'give me a lawyer,' was an ambiguous request for counsel," Maj Op. at 27; and "[t]here was no ambiguity regarding what Sessoms wanted: a lawyer." Maj. Op. at 30. These appear to be disagreements with the State court's view of the facts, not with the application of clear Federal law.

Critically, some of the reasons offered by the majority to support its conclusion were rejected by the Supreme Court in *Salinas*. The majority asserts that the "detectives understood that Sessoms was requesting counsel," Maj. Op. at 24; and that the "detectives' behavior confirms that—like any reasonable law enforcement officers—they understood that Sessoms was requesting counsel." Maj Op. at 29. However, the plurality opinion in *Salinas* noted that the Court had "repeatedly held that the express invocation requirement applies even when an official has reason to suspect that the answer to his question would incriminate the witness." 133 S. Ct. at 2181. Thus, as in *Salinas*, whether Sessoms's statements were ambiguous does not turn on whether the

---

disputed, a determination of whether a suspect's statement concerning counsel is ambiguous is a question of law, not fact. This does not seem right.

detectives probably understood that Sessoms was requesting counsel.**⁵**

Furthermore, as Judge Murguia notes in her dissent, the detectives' reaction was consistent with concerns that Sessoms *might* be invoking his right to counsel. As Justice Alito explained in *Salinas*, the Government is entitled to a clear invocation in order that it may consider curing "any potential self-incrimination through a grant of immunity." 133 S. Ct. at 2179. Here, the detective did not ignore Sessoms statements, but returned to the subject, telling Sessoms "[i]f you said you didn't want to make any statement without an attorney, we're not really going to be able to talk to you." In response, Sessoms did not ask for counsel. Nor is he claiming that he was pressured into an involuntary waiver. Rather, he asserts that his two statements were so clear as to require the immediate cessation of questioning. I do not read the Supreme Court's opinions in *Salinas*, or *Davis*, as directing such a conclusion.

Because Supreme Court precedent does not compel a determination, either as a matter of law or fact, that Sessoms's statements, either separately or together, constitute an unambiguous invocation of his right to counsel, we are compelled to deny him relief. "A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness

---

**⁵** Such a test was implicitly rejected in cases such as *Davis v. United States*, 512 U.S. 452, 459 (1994) ("Maybe I should talk to a lawyer."); and *United States v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005) ("[B]ut, excuse me, if I am right, I can have a lawyer present through all this, right?"). In both instances, the officers probably understood the intent behind the defendants' ambiguous statements.

of the state court's decision." *Harrington v. Richter*, 131 S. Ct. 770, 786 (2011). Indeed, recognizing the deference due to the California Court of Appeal's determination is the most reasonable explanation for why the Supreme Court vacated our prior en banc opinion and remanded the case for consideration in light of *Salinas*. I would follow the Supreme Court's advice rather than challenge it to order our compliance.

---

MURGUIA, Circuit Judge, with whom KOZINSKI, Chief Judge, and SILVERMAN, CALLAHAN, and IKUTA, Circuit Judges, join, dissenting:

When Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), it severely restricted the power of federal courts to provide relief to habeas petitioners convicted in state court, even when we might believe that the conviction was the result of unlawful proceedings. The statutory provision at issue here, 28 U.S.C. § 2254(d), provides that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Our inquiry falls under § 2254(d)(1); specifically, we must consider whether the California Court of Appeal "unreasonabl[y] appli[ed]" the Supreme Court's holding in *Davis v. United States*, 512 U.S. 452, 459 (1994). *Davis* held that a suspect "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney" before the interrogating officers are required to stop questioning the suspect under the Supreme Court's rule in *Edwards v. Arizona*, 451 U.S. 477 (1981).[1] Under AEDPA, this inquiry is much narrower than simply evaluating whether the state court correctly applied *Davis*.

> For purposes of § 2254(d)(1), "an *unreasonable* application of federal law is different from an *incorrect* application of federal law." A state court must be granted a deference and latitude that are not in operation when the case involves [direct review].

*Harrington v. Richter*, 131 S. Ct. 770, 785 (2011) (quoting *Williams v. Taylor*, 529 U.S. 362, 410 (2000)). Indeed, we may only grant habeas relief where "there is no possibility

---

[1] As the majority correctly observes, although the Supreme Court's holding in *Davis* applied only to waivers of the right to counsel made after a suspect had been informed of and waived his *Miranda* rights, *Salinas v. Texas*, 133 S. Ct. 2174 (2013), suggests that the "unambiguous request" rule applies in a pre-waiver context as well.

fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents." *Id*. at 786.

The Supreme Court has recognized that AEDPA, by its intention and design, prohibits us from granting relief in almost all cases in which a petitioner alleges that federal law has been unreasonably applied. *See id.* "As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." *Id*.

Thus, AEDPA has the effect of limiting this court's consideration of Sessoms's petition to an excruciatingly narrow question. It does not matter whether we believe that the state court *incorrectly* applied *Davis*. It does not matter whether we believe that the state court's decision was inconsistent with the vital constitutional principle that animated *Edwards* – that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him." 451 U.S. at 484–85. It does not matter whether the best practice for the officers interrogating Sessoms would have been to ask him to clarify whether he indeed wanted the assistance of counsel. Under AEDPA, the only question that matters to us now is whether any fairminded jurist could determine that Sessoms "ma[de] a reference to an attorney that [was] ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel." *Davis*, 512 U.S. at 459.

I believe that a fairminded jurist could reach such a conclusion. Sessoms first asked, "There wouldn't be any

possible way that I could have a, a lawyer present while we do this?"  This question, punctuated with hesitation and conditions and phrased in the negative, is subject to different interpretations and comparable to statements that this court and other courts have found ambiguous.  *Compare Davis*, 512 U.S. at 455 ("Maybe I should talk to a lawyer."); *United States v. Younger*, 398 F.3d 1179, 1187 (9th Cir. 2005) ("[B]ut, excuse me, if I am right, I can have a lawyer present through all this, right?"); *Clark v. Murphy*, 331 F.3d 1062, 1065 (9th Cir. 2003) ("I think I would like to talk to a lawyer."), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003); *United States v. Doe*, 170 F.3d 1162, 1166 (9th Cir. 1999) ("What time will I see a lawyer?"); *Diaz v. Senkowski*, 76 F.3d 61, 63–65 (2d Cir. 1996) ("I think I want a lawyer."); *Lord v. Duckworth*, 29 F.3d 1216, 1218–21 (7th Cir. 1994) ("I can't afford a lawyer but is there any way I can get one?"); *with Anderson v. Terhune*, 516 F.3d 781, 783 (9th Cir. 2008) (en banc) ("I plead the Fifth."); *Edwards*, 451 U.S. at 479 ("I want an attorney before making a deal.").

Sessoms followed up his question by stating, "That's what my dad asked me to ask you guys . . . uh, give me a lawyer."  It is unclear if Sessoms was merely expressing his father's opinion or if he was agreeing with his father and he himself wanted an attorney.  Either interpretation is plausible.  A reasonable jurist could conclude that telling a detective, "My dad told me to ask for a lawyer" is different than saying, "I want a lawyer."  Because a reasonable jurist could find either of Sessoms's statements – or both, considered together – ambiguous or equivocal, relief is barred by AEDPA.

The majority points to the detective's behavior in reaction to Sessoms's statements as evidence that the detective believed Sessoms had invoked his right to counsel.

According to the majority, the officer attempted to "talk Sessoms out of an attorney," which demonstrates that the officer understood Sessoms to have invoked his right to speak with counsel. The detective's reaction, however, could easily have been that of an officer faced with a suspect who only *might* have invoked his right to counsel. The detective's acknowledgment of Sessoms's statements about speaking to an attorney supports this theory:

> Uh, I want to back up to your question you asked about an attorney. Um, first, before you ask questions, uh, I'm going to tell you why we're here, just lay it out and be up front. And then – then I'm going to advise you of your rights. And then it's up – for you to decide if you want the attorney or not.

The majority believes the officers should have answered Sessoms's question by simply saying "yes," reading him his *Miranda* rights, and then terminating the interrogation in the absence of a clear waiver. Maj. Op. at 25–26. The majority likewise believes that, in the brief exchange before Sessoms was read his *Miranda* rights, the detective manipulated Sessoms into waiving his right to counsel. Again, however, Sessoms is not claiming that he was pressured into an involuntary waiver, but only that he asked for counsel, which should have terminated the interrogation. "[T]he *likelihood* that a suspect would wish counsel to be present is not the test for applicability of *Edwards*." *McNeil v. Wisconsin*, 501 U.S. 171, 178 (1991). Unless Sessoms clearly invoked his right to counsel, the police officers were not required to take any particular course of action in response to his statements or questions. *See Davis*, 512 U.S. at 460. As such, the

majority's focus on the detective's reaction to Sessoms's statements is misplaced.

While the majority correctly observes that the state court should have considered Sessoms's statements together rather than in isolation, that is not a basis for granting habeas relief where, as here, the state court could have reached the same outcome even if it had done so. *See Harrington*, 131 S. Ct. at 786 ("[A] habeas court must determine what arguments or theories supported or . . . could have supported[] the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of this Court."). Although the majority may offer the most logical interpretation of what Sessoms was attempting to communicate by his statements, there are other interpretations that are at least reasonable, even if less compelling.[2] Even taking Sessoms's statements together, those statements contained just enough ambiguity that a fairminded jurist could conclude that Sessoms was indicating only that he *might* want the assistance of counsel.

I acknowledge that this reasoning results in a harsh outcome for a nineteen-year-old who turned himself in, expressly told the officers that his father wanted him to have a lawyer, and may have simply been trying to be respectful

---

[2] The majority's characterization of this assessment as "jettison[ing] the only 'logical interpretation' of Sessoms's statements," Maj. Op. at 28, misapprehends the structure that AEDPA imposes on our inquiry. We do not seek to identify the best interpretation of Sessoms's statements. Our task is to identify the universe of reasonable interpretations. Here, if the state court's understanding of Sessoms's statements can meet the extremely low bar that the Supreme Court has set for reasonableness, then we are precluded from granting relief.

when asking for counsel. However, the potential for a harsh outcome does not permit us to disregard AEDPA's "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1398 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Could the police officers have assumed that Sessoms was in fact asking for a lawyer? Yes. Was it objectively unreasonable for the California Court of Appeal to hold that a police officer could have interpreted Sessoms's statement as merely a possible request for a lawyer, which would not require the officer to stop the interrogation? I cannot say that it was. Because this court is constrained by the deference mandated by AEDPA, even when faced with a close case in which it may have ruled differently than the state court, I respectfully dissent.