**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| DARIOUS A. MAYS, *Petitioner-Appellant*, | No. 12-17189 |
| v. | D.C. No. 2:10-cv-00533-LKK-CHS |
| KEN CLARK, Warden, *Respondent-Appellee*. | OPINION |

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior District Judge, Presiding

Argued and Submitted November 19, 2014
Submission Deferred January 8, 2015
Resubmitted December 8, 2015
San Francisco, California

Filed December 8, 2015

Before: Sidney R. Thomas, Chief Judge and Stephen
Reinhardt and Morgan Christen, Circuit Judges.

Opinion by Judge Christen

**SUMMARY**[*]

**Habeas Corpus**

The panel affirmed the district court's denial of Darious Antoine Mays's  habeas corpus petition challenging his conviction for first-degree murder.

The panel held that the California Court of Appeal unreasonably applied *Miranda v. Arizona*, 384 U.S. 436 (1966), and *Davis v. United States*, 512 U.S. 452 (1994), when it concluded that Mays's invocation of the right to counsel was ambiguous or equivocal.  The panel also held that the California Court of Appeal contravened or unreasonably applied *Smith v. Illinois*, 469 U.S. 91 (1984), when it used Mays's post-invocation responses to cast doubt on the clarity of his request for counsel.

The panel held that although Mays's inculpatory statements were therefore improperly admitted at trial, the California Court of Appeal's harmlessness determination was not objectively unreasonable, and that under the deferential AEDPA standard of review, Mays is not entitled to habeas relief.

---

[*] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Marylou Elin Hillberg (argued), Sebastopol, California, for Petitioner-Appellant.

David Andrew Eldridge (argued), Deputy Attorney General; Kamala D. Harris, Attorney General; Michael P. Farrell, Senior Assistant Attorney General; and Brian G. Smiley, Supervising Deputy Attorney General, Office of the California Attorney General, Sacramento, California, for Respondent-Appellee.

**OPINION**

CHRISTEN, Circuit Judge:

At age 17, Darious Antoine Mays was charged with murdering Sheppard Scott as Scott sat in his car at a drive-through Jack In the Box restaurant. A detective conducted a custodial interrogation of Mays. During the interrogation, Mays requested a lawyer. Instead of ceasing the interrogation, the detective continued to question Mays and ultimately administered a fake polygraph test. When confronted with fabricated test results, Mays admitted to being present at the scene and to being one of two individuals depicted in a security camera photograph of the crime scene.

The state trial court denied Mays's motion to exclude his statements. Mays was convicted of first-degree murder and sentenced to life without possibility of parole. The California Court of Appeal affirmed Mays's conviction, reasoning that his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), were not violated during the interrogation, and that even if

they were, the admission of his statements at trial was harmless beyond a reasonable doubt.

Mays petitioned the federal district court for habeas relief under 28 U.S.C. § 2254. The district court concluded the California Court of Appeal's determination that no *Miranda* violation occurred was an unreasonable application of Supreme Court precedent, but also decided that the admission of the statements was not prejudicial. We agree with the district court's reasoning and affirm the denial of Mays's habeas petition.

## BACKGROUND[1]

In the early morning hours of January 24, 2005, Sheppard Scott and his girlfriend, Yalandria Narcisse, were in a car at a Jack In the Box drive-through waiting to order food. *People v. Mays*, 95 Cal. Rptr. 3d 219, 223 (Cal. Ct. App. 2009). Surveillance cameras captured two individuals outside an adjacent AM/PM store. *Id.* at 224. Witnesses agreed that one was wearing an orange Orioles jacket. The other wore a gray hooded sweatshirt. *Id.* at 223–24. Witnesses also

---

[1] Under the Antiterrorism and Effective Death Penalty Act, "state court findings of fact are presumed correct unless rebutted by clear and convincing evidence." *Gonzales v. Pliler*, 341 F.3d 897, 903 (9th Cir. 2003) (citing 28 U.S.C. § 2254(e)(1)). Both Mays and the State rely heavily on the California Court of Appeal's decision in framing the underlying facts of the case, and we do the same. We note that the California Court of Appeal's opinion in this case was certified only for partial publication. The "factual and procedural background" section, which discusses the evidence adduced at Mays's trial, was published, and we have included reporter citations where we rely on it. The section of the California Court of Appeal's opinion addressing Mays's interrogation and his *Miranda* claim was not published but was included in the excerpts of record for this case.

agreed that one of those two individuals shot Scott several times. *Id.* at 224–25.

Mays was arrested in connection with the crime on the afternoon of February 9, 2005. He was taken to the police station and questioned by Detective Charles Husted. The interview was videotaped.

## I. The Interrogation

At the outset of the interview, Detective Husted read Mays his *Miranda* rights and asked if Mays understood each right. Mays's responses were affirmative or inaudible. Detective Husted then asked Mays if he knew why he was being detained. Mays responded: "Because of the shit that seen on the news. . . . My face is wanted for questioning for a murder." But Mays denied having any involvement in the murder.

Detective Husted told Mays that witnesses had identified him, and presented Mays with a photograph from an AM/PM surveillance video of an individual wearing a gray sweatshirt. Mays denied being depicted in the photo. He argued his nose was shorter, and his only gray sweatshirt had "South Pole" written on it. Detective Husted left the room and returned with a different photo. Mays admitted to being the person depicted in this photo, and Detective Husted told Mays this photo was merely a photocopy of the first. Detective Husted told Mays to stop lying. Mays responded: "Can you – can you give me a lie detector test? I guarantee you I'll pass a hundred percent." Detective Husted expressed doubt that Mays could pass a polygraph test, and then the following exchange ensued:

MAYS: Look. Can I – can I call my dad so I can have a lawyer come down 'cause I'm – I'm telling you, I'm –

DET. HUSTED: Call who?

MAYS: My – my step-dad 'cause I'm – I'm going to tell you I'm going to pass that test a hundred percent.

DET. HUSTED: Okay. Well, we don't need your step-dad right now.

MAYS: I know. He got my lawyer.

DET. HUSTED: Who's your lawyer?

MAYS: My – my step-dad got a lawyer for me.

DET. HUSTED: Okay. So what do you want to do with him?

MAYS: I'm going to – can – can you call him and have my lawyer come down here?

DET. HUSTED: [Unintelligible.]

MAYS: I'm telling you – I'm telling you this is not me.

DET. HUSTED: Well, it – you've been identified.

MAYS:  Can you give me a lie detector test?

DET. HUSTED:  [Unintelligible.]

MAYS:  I'll guarantee you I'll pass it.

DET. HUSTED:  [Unintelligible.]

MAYS:  What you all – and what you all going to say then?

DET. HUSTED:  Well, I don't –

MAYS:  What you all going to say when I pass it?

DET. HUSTED:  I don't think you'll pass.

MAYS:  I guarantee you I'll pass it.

DET. HUSTED:  Well, I don't – I don't think –

MAYS:  Can I get one?

DET. HUSTED:  Yeah. I will.

MAYS:  Can I get one?

DET. HUSTED:  Do you want – do you want to make a statement about what happened?

MAYS:  I'm telling you this is not me, sir.

DET. HUSTED:  Okay.

MAYS:  I'm not – I'm not going to sit here and lie to you.

DET. HUSTED:  All right.

MAYS:  You can give me a lie detector test, and I'll guarantee you I'll pass it.

DET. HUSTED:  And you weren't out there?

MAYS:  I was not up there.  I was at Ramone house.  I'm going to tell you the whole night that – what – what – what, ah, the night –

DET. HUSTED:  Well, it's up to you.  I mean, do you want the attorney down before you make the statement or do you want to make a statement and tell me what's going on?

MAYS:  I want a lie detector test.

DET HUSTED:  Okay.  I – it's going to take a minute for me to set that up.

MAYS:  Sir.

DET. HUSTED:  Do you want to tell me the story or do you want me to [unintelligible]?

MAYS:  I'm telling you – I'm telling you – ask Ramone where I was the day that the sho – that the stuff that happened.  He going to tell

you I was at his house sleeping on the couch. I was at his house for two weeks.

DET. HUSTED:  I – I tri – I already asked him that.  He knows –

MAYS:  I was at his house for two weeks straight.

DET. HUSTED:  Okay.

MAYS:  And if I'm not there, I'm at – I'm at my girl auntie house sleep.  I'm telling you, sir, this is not me at all.

DET. HUSTED:  All right.  Do you mind answering some questions?

MAYS:  Yes, sir.

Detective Husted proceeded to ask Mays several questions, and Mays continued to deny any involvement in the crime.  Detective Husted left the room.  When he returned, the following exchange ensued:

DET. HUSTED:  Looks like I may have found somebody to do it for you.  Okay?  Give you the polygraph.  Still working on [unintelligible].  But I just wanted to clarify and make sure that I'm not violating your *Miranda* Rights or anything like that.  Um, do you want to do the polygraph and talk to the person?  Answer the questions?  Is that what you want to do?

MAYS:  Yes, sir.

DET. HUSTED:  Okay.  Well, you – you had mentioned something about your step-dad having an attorney for you and so I said I don't want to violate your *Miranda* Rights and do all that.  But it seems like you're being cooperative, so I just want [to] get a clear idea of where you're coming from.

MAYS:  Huh?

DET. HUSTED:  I was – (cough) – excuse me.  I was getting some peanuts.  I just want to get a clear idea of where you're coming from.  Do you want to talk to the polygraph guy?  Go through his questions?

MAYS:  Yeah.

DET. HUSTED:  So you're willing to do that?

MAYS:  Yes, sir.

DET. HUSTED:  Okay.  Let me go see if – if, ah, he for sure can do it.  And then, ah, we'll set you up.  Is that okay?

Detective Husted left the room once again.  When he returned, he told Mays that he was still working on the polygraph test and that his partner was talking to Mays's girlfriend. Detective Husted continued to question Mays, and Mays continued to deny involvement in the crime and to repeat his request for a lie detector test.  Detective Husted

then brought Mays's girlfriend in and permitted her to speak with Mays alone in the interrogation room. When Detective Husted returned, Mays asked to make a phone call. Detective Husted left and another officer entered and asked whether Mays wished to make a phone call. Mays told the officer he wanted to call his mother, and the officer left.

Detective Husted returned and asked yet more questions. Mays continued to deny involvement in the crime and again repeated his request for a lie detector test. Detective Husted left and returned, and Mays repeated his request for a phone call. Detective Husted told Mays his mom might not be available. Mays responded: "Can I – can I call my grandma at least? I need – I need to call somebody." Detective Husted said he was trying to get someone to administer a polygraph and could "[o]nly do one thing at a time."

As it turns out, no polygraph examiner was available and Detective Husted's supervisor authorized a "mock polygraph" test. "[T]he police placed on [Mays's] body patches connected to wires, pretended to administer a lie detector test, fabricated written test results, showed [Mays] the fake results, and told him the results showed he failed the test." *Id.* at 226. Mays expressed skepticism, and Detective Husted suggested that perhaps Mays had been present at the crime and felt responsible. *Id.* At this point, Mays changed his story and made various inculpatory statements. The California Court of Appeal summarized:

> [Mays] then admitted he was present at the shooting, and he was the person wearing the gray sweatshirt in the AM/PM photo, but he said he knew nothing about the shooting in advance and did not participate. He said the

> shooter was the person in orange, whom [he] had just met that day. The day after the shooting, the shooter found [Mays] and threatened him. [Mays] admitted gang membership. [Mays], who cut his hair after the shooting, first said his brother made him cut it, but he did not remember why. [Mays] immediately thereafter said he guessed the reason was because his cousin said the victim's brother mistakenly thought [Mays] was involved and was hunting for him.

*Id.* During questioning, Mays incorrectly identified the passenger in the car as a male. Eventually, Detective Husted revealed that three witnesses had identified the person in gray as the shooter. Mays broke down crying, continued to insist he did not shoot Scott, and asked for his mother. He said he was going to kill himself. The interrogation ended when Mays complained of chest pains and said he was born with a hole in his heart.

## II.  Trial and Direct Appeal

Mays was charged with first-degree murder, with a special circumstance of lying-in-wait and an enhancement for personal discharge of a firearm causing death. *Id.* at 222–23. Before trial, Mays moved in limine to exclude the inculpatory statements he made to Detective Husted on the ground that they were obtained in violation of *Miranda*. The trial court denied the motion.

The California Court of Appeal described the evidence adduced at Mays's trial as follows:

> Yalandria Narcisse testified she was the victim's girlfriend and was with him when he was shot. Around 4:30 a.m. on January 24, 2005, they were in a car waiting to order food at the Jack In The Box drive-through on Norwood Avenue. Two persons standing outside the adjacent "ampm" store asked if the victim had any weed, and he said no. The victim told Narcisse one of the two persons insulted him, calling him a "bitch-ass nigger or something." She said she did not hear that. The victim got out of the car and engaged in an animated conversation with the two persons, during which the victim stated a gang affiliation. As the victim walked back to the car, Narcisse saw one of the persons, dressed in orange (an Orioles jacket), pass something to the other person, who was dressed in a gray hooded sweatshirt. The victim collected the food and drove to the exit. Somebody yelled, "hey, homey," and the victim stopped the car. The gray-clad male came up to the car and said he wanted to apologize. The victim said to forget about it. The person in gray held out his hand to shake. The victim, still seated in the car, held out his hand. The person in gray pulled out a gun, fired several shots at the victim, and ran off (following the person in the orange jacket).

Narcisse (and other witnesses) said the shooter fired the gun with his right hand. Defendant (and others) testified defendant is left-handed. Narcisse testified, "The guy in the gray sweater took out his hand, took out his hand to shake, to shake [victim] Sheppard's and then Sheppard stuck out his hand and when the guy pulled out his hand he had a gun and he started shooting." This would only make sense if the shooter had the gun in the hand other than the one he extended to shake hands. Narcisse thought the shooter had gold teeth (defendant does not have and denies ever having worn gold teeth), and from her seated position she thought the shooter stood about 5 feet 1 inch tall (defendant is 5 feet 7 inches tall).

Narcisse and the victim had been drinking alcohol that night. The police did not determine the extent of Narcisse's drinking. An autopsy revealed the victim, who had a blood alcohol level of .11 percent, was shot six times.

Surveillance cameras at AM/PM did not capture images of the shooting but did capture images of the persons wearing gray and orange and shows one of them pointing at the victim's vehicle as it passes through the AM/PM parking lot on its way to Jack In The Box. The images of the suspects are not clear.

*Id.* at 223–24 (footnotes omitted). The California Court of Appeal then described the testimony of various additional witnesses who happened to be present that morning. The witnesses supported Narcisse's testimony that the shooter was the male in the gray sweatshirt, but they were either unable to identify the shooter or were unsure if it was Mays. *See id.* at 224–25. The California Court of Appeal continued:

> The prosecution sought (over defense objection) to conduct a conditional examination of Tamara Schallenberg, a neighbor who considers defendant like a son, on the ground she had phobias precluding testimony in open court. A psychiatry resident who treated her testified Schallenberg has a panic disorder with agoraphobia, characterized by sudden onset of shortness of breath, chest pain, dizziness, and extreme fear. Schallenberg has reported passing out when a panic attack brought on an asthma attack. The doctor did not believe Schallenberg was faking. The doctor said Schallenberg may be able to testify if she takes a sedative, but the risk was oversedation. The court allowed a conditional examination of Schallenberg in a courtroom, in the presence of the judge, court staff, counsel for both sides, and defendant; the jury and the public were excluded. The conditional examination was videotaped. The court found the witness's infirmity made her unavailable to testify in open court. The videotaped conditional examination was played for the jury in open court.

In her conditional examination, Schallenberg denied making statements to the police, including identification of defendant and his brother as the persons depicted in the AM/PM photos. She testified that she told the officer the person in the photo might be defendant, but she was not sure. She testified she never saw defendant wear a light gray sweatshirt. She denied ever seeing defendant deal drugs and denied that he ever said he was a gang member. Schallenberg testified she has known defendant since 1999, and he is like a son to her. She admitted that one day in January 2005, she received a phone call from defendant's mother around 5:00 a.m. As a result of the call, Schallenberg went out looking for defendant, but she did not find him. The next day, she saw defendant and asked him what was going on. Defendant said he was with his brother at the AM/PM, and his brother shot somebody. In her conditional examination, Schallenberg said defendant laughed when he told her, but it was a "scared" laugh. Schallenberg also admitted that she and defendant had a telephone conversation while he was in jail, in which he said the investigator said she should testify in court that she made false statements to the police because she was mad at defendant.

Detective Charles Husted testified about his audiotaped interview of Schallenberg. He showed Schallenberg the AM/PM photo, and she stated without hesitation that the person in

the gray sweatshirt was defendant. Husted asked how she knew, and she said she knew because she knows him. She also recognized his sweatshirt, which he wore all the time, which had "South Pole" written on its back. She also said the person in the orange Orioles hat and jacket was defendant's older brother "Rico" (Deladier Montue). Husted said Schallenberg said defendant laughed like "he thought it was funny" when he told her about his being at the AM/PM when his brother shot someone. Husted said Schallenberg said defendant said he was a gang member, and she had seen him apparently selling drugs.

*Id.* at 225 (footnote omitted). After again describing uncertain or inconsistent witness testimony regarding the shooter's identity, *id.* at 226, the Court of Appeal continued:

Defendant's girlfriend, Judy Perez, testified she never spoke with defendant about the shooting. She denied telling the police that defendant said his brother was involved. After the prosecutor showed Perez portions of her videotaped conversation with police, she admitted she told them that defendant said his brother was involved (though she did not remember telling them that).

Detective Husted testified [about his interrogation of defendant]. . . .

. . . The videotaped police interview of defendant was played for the jury.

> Defendant testified at trial. He is left-handed.
> He denied ever wearing jewelry or gold teeth
> (as some witnesses described the shooter). He
> denied shooting Sheppard Scott and denied
> even being present when Scott was shot. He
> claimed his inconsistent statements to the
> police were false admissions given only
> because he felt defeated after the fake lie
> detector test, which he did not know was fake,
> and he just said what the police wanted to
> hear. Defendant admitted prior trips to
> Juvenile Court for fleeing police officers
> while driving; none of his prior misconduct
> involved assault with a gun. He admitted
> selling drugs and being a member of a street
> gang.
>
> The defense tried to call as a witness Marcos
> Adams (also known as Marcus Adams), but
> he invoked his Fifth Amendment and refused
> to answer questions.

*Id.* at 226–27 (footnote omitted). The California Court of
Appeal also noted that the police seized a gray hooded
sweatshirt with "South Pole" lettering at the time they
arrested Mays, but stated "the People acknowledge
defendant's South Pole sweatshirt is not the sweatshirt
depicted in the AM/PM photos." *Id.* at 225 n.4.

The jury convicted Mays of first-degree murder and found
true the special circumstance and firearm enhancement. *Id.*
at 227. The trial court sentenced Mays to life without
possibility of parole for the special circumstance murder, plus
a consecutive term of 25 years to life for the firearm

enhancement. *Id.* Mays appealed, arguing, among other things, that the trial court erred by admitting the inculpatory statements he made to Detective Husted because they were obtained in violation of *Miranda*. *Id.* at 222–23.

The California Court of Appeal affirmed Mays's conviction. The court ruled there was no *Miranda* violation because Mays's request for an attorney was equivocal. The court also ruled that "[e]ven assuming for the sake of argument that a *Miranda* violation occurred, it would not require reversal of the judgment" because the error "was harmless beyond a reasonable doubt." The California Supreme Court denied Mays's petition for review. Mays also raised his *Miranda* claims in a petition for a writ of habeas corpus filed in California state court. That petition was also denied.

## III.    Federal Habeas Petition

Mays filed a petition for a writ of habeas corpus in federal district court on February 23, 2010. The district court held the California Court of Appeal's ruling that no *Miranda* violation occurred was an unreasonable application of clearly established federal law. It also concluded that "the state court's rejection of the [*Miranda*] claim should stand because the state court's finding of no prejudice is a reasonable application of clearly established Supreme Court precedent." It denied the petition but granted a certificate of appealability on the *Miranda* claim.

## JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 2253. We review the district court's denial of Mays's § 2254 habeas corpus

petition de novo. *Gonzalez v. Duncan*, 551 F.3d 875, 879 (9th Cir. 2008). We examine the last reasoned state-court decision, which in this case is the opinion of the California Court of Appeal. *See Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003). On habeas review, the Antiterrorism and Effective Death Penalty Act (AEDPA) prevents us from granting Mays's petition unless the California Court of Appeal's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

"'Clearly established Federal law' . . . is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003). A state court decision is "contrary to clearly established Federal law" if "the state court applies a rule different from the governing law set forth in [the Supreme Court's] cases, or if it decides a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A state court decision is an "unreasonable application of clearly established federal law" if "the state court correctly identifies the governing legal principle . . . but unreasonably applies it to the facts of the particular case." *Id.* The Supreme Court has stressed that the state court's application of clearly established federal law must be "objectively unreasonable" to meet AEDPA's demanding standard. *Williams v. Taylor*, 529 U.S. 362, 409 (2000). "[A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law." *Id.* at 410.

## DISCUSSION

**I. The California Court of Appeal's ruling that no *Miranda* violation occurred was an unreasonable application of clearly established Supreme Court precedent.**

In *Miranda v. Arizona*, the Supreme Court held that a suspect in a custodial interrogation has the right to have counsel present, and police must explain this right to the suspect before questioning begins. 384 U.S. 436, 469–72 (1966). The suspect may waive his right to counsel, "provided the waiver is made voluntarily, knowingly and intelligently." *Id.* at 444. Even after a waiver, however, if the suspect requests counsel, all questioning must cease. *Id.* at 444–45; *see also Edwards v. Arizona*, 451 U.S. 477, 484–85 (1981) ("[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."). If the police do not cease questioning, the suspect's "postrequest responses to further interrogation may not be used to cast doubt on the clarity of his initial request for counsel." *Smith v. Illinois*, 469 U.S. 91, 92 (1984) (per curiam).

In *Davis v. United States*, the Supreme Court clarified that a suspect's request for counsel must be unambiguous. 512 U.S. 452, 459 (1994). The Court explained that "if a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer in light of the circumstances would have understood only that the suspect *might* be invoking the right to counsel," cessation of

questioning is not required. *Id.* For example, Davis's statement to agents—"Maybe I should talk to a lawyer"—was not an unambiguous and unequivocal invocation of the right to counsel, and therefore suppression of Davis's subsequent statements was not required. *See id.* at 462.

Here, the California Court of Appeal correctly identified *Davis* as governing Supreme Court precedent. It explained that Mays's first mention of a lawyer was the statement: "Look. Can I – can I call my dad so I can have a lawyer come down 'cause I'm – I'm telling you, I'm –." The state trial court found this first reference to a lawyer was "inaudible from the perspective of Detective Husted," and the California Court of Appeal held its "own viewing of the videotape satisfies us that it was reasonable that the detective did not hear this first reference to a lawyer." The state court therefore focused on the following exchange:

> MAYS: My – my step-dad got a lawyer for me.
>
> DET. HUSTED: Okay. So what do you want to do with him?
>
> MAYS: I'm going to – can – can you call him and have my lawyer come down here?
>
> DET. HUSTED: [Unintelligible.]
>
> MAYS: I'm telling you – I'm telling you this is not me.

The court held that Mays's question—"[C]an you call him and have my lawyer come down here"—was equivocal. The

court also observed that "less than a second" occurred between this question and Mays's subsequent statement—"I'm telling you – I'm telling you this is not me"—and noted that Detective Husted subsequently sought "to clarify whether [Mays] wanted to talk to his lawyer or whether he wanted the lie detector test that he kept demanding."

Like the district court, we conclude that the California Court of Appeal applied *Miranda* and its progeny in an objectively unreasonable manner. Despite Detective Husted's response, "Call who?," we accept as true the state court's factual finding that Detective Husted did not hear Mays's first reference to a lawyer. *See* 28 U.S.C. § 2254(e)(1). "We, therefore, do not rely on th[is] statement[] as part of the context relevant to whether a reasonable law enforcement officer would have understood [Mays's] statements as unambiguous requests for counsel." *Sessoms v. Grounds*, 776 F.3d 615, 618 n.3 (9th Cir. 2015) (en banc). We focus instead on Mays's subsequent statement: "My – my step-dad got a lawyer for me. . . . I'm going to – can – can you call him and have my lawyer come down here?"

Contrary to the California Court of Appeal's ruling, there is nothing ambiguous or equivocal about this statement: it is plainly a request for a lawyer. A reasonable officer would have understood that Mays's father had retained a lawyer, and Mays wanted the lawyer to be sent to the interrogation to represent him.

We recently addressed a similar fact pattern in *Sessoms v. Grounds*, where the defendant made two statements: (1) "There wouldn't be any possible way that I could have

a—a lawyer present while we do this?"; and (2) "Yeah, that's what my dad asked me to ask you guys . . . uh, give me a lawyer." *Id.* at 617–18. We found each to be an unambiguous request for counsel. *See id.* at 626–27. Of particular relevance here, we explained with regard to the first statement:

> Unlike *Davis*, where the defendant asked, "[m]aybe I should talk to a lawyer?," Sessoms was not asking whether he *should* speak to a lawyer. Like the defendant in *United States v. Lee*, 413 F.3d 622, 625 (7th Cir. 2005), who asked, "[c]an I have a lawyer?"—which the Seventh Circuit recognized as an unequivocal request for counsel—Sessoms was deferentially asking whether he *could* have a lawyer. . . . There was no ambiguity in the first request for counsel—Sessoms was expressing his desire to speak to an attorney . . . .

*Id.* at 626. Like Sessoms, Mays asked for a lawyer. Also like Sessoms, Mays phrased his request deferentially but unambiguously.

The State argues that even if Mays's request for an attorney was unambiguous, the California Court of Appeal reasonably concluded that his subsequent statement—"I'm telling you – I'm telling you this is not me"—rendered his request equivocal. But the California Court of Appeal's reliance on this and other postrequest statements to cast doubt on the clarity of Mays's previous request for a lawyer was contrary to, or an unreasonable application of, the Supreme

Court's decision in *Smith v. Illinois*, 469 U.S. at 92.**[2]**  Further, Mays's statement reiterating his innocence was in no way inconsistent with his unambiguous request for a lawyer and it cannot be interpreted as a suggestion that he had changed his mind or was undecided about wanting counsel.

Once Mays invoked his right to counsel, Detective Husted failed to immediately cease the interrogation as he was required to do under clearly established Supreme Court precedent.**[3]**  *See Edwards*, 451 U.S. at 484–85.  Instead, Detective Husted immediately provoked Mays by telling him he had been identified and ultimately employed a mock polygraph examination.  It is not surprising Mays succumbed to this pressure.  *See Miranda*, 384 U.S. 436, 455 (1966) (explaining that even *without* employing "the 'third degree'" or other coercive tactics, "the very fact of custodial

---

**[2]** The Supreme Court in *Smith* reviewed a state court determination that Smith's request was ambiguous, *id.*, but the Supreme Court did not distinguish between ambiguity and equivocation.  *See, e.g.*, *id.* at 100 ("Our decision is a narrow one.  We do not decide the circumstances in which an accused's request for counsel may be characterized as *ambiguous or equivocal* as a result of events preceding the request or of nuances inherent in the request itself, nor do we decide the consequences of such *ambiguity or equivocation*.") (emphasis added).

**[3]** Because Detective Husted never ceased questioning Mays, we reject the State's alternative argument, under *Oregon v. Bradshaw*, 462 U.S. 1039 (1983), that Mays "reinitiated" the discussion thereby waiving his previously-invoked right to counsel.  *See id.* at 1044–46 (plurality opinion) (explaining suspect's post-invocation statements may be deemed waiver of right to counsel only if police ceased questioning and suspect later initiated further discussion about the investigation).  And even were we to consider Mays's statement — "I'm telling you – I'm telling you this is not me" — in context it did not "evince[] a willingness and a desire for a generalized discussion about the investigation."  *Id.* at 1045–46.

interrogation exacts a heavy toll on individual liberty and trades on the weakness of individuals").

We conclude the California Court of Appeal unreasonably applied *Miranda* and *Davis* when it concluded Mays's invocation of the right to counsel was ambiguous or equivocal. We also conclude that the California Court of Appeal contravened or unreasonably applied *Smith* when it used Mays's post-invocation responses to cast doubt on the clarity of his request for counsel.

## II. The California Court of Appeal's finding that any *Miranda* violation was harmless was not unreasonable under AEDPA.

Although we conclude Mays's inculpatory statements to Detective Husted were obtained in violation of *Miranda* and therefore improperly admitted at trial, we grant the writ only if the error was not harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 295 (1991); *Sessoms*, 776 F.3d 615, 629 (9th Cir. 2015) (en banc).

On direct review, reversal is not required if the prosecution can show the error "was harmless beyond a reasonable doubt." *Fulminante*, 499 U.S. at 295–96 (quoting *Chapman v. California*, 386 U.S. 18, 24 (1967)). The California Court of Appeal applied this standard and concluded that the admission of Mays's inculpatory statements was harmless beyond a reasonable doubt for two reasons: (1) the statements would have been admissible to impeach Mays's trial testimony even if they were obtained in violation of *Miranda*; and (2) the other trial evidence was so strong that Mays would have been convicted even if the statements had not been admitted.

On collateral review, relief is appropriate "if the prosecution cannot demonstrate harmlessness," *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015), but an error is harmless on collateral review unless it results in "actual prejudice," *id.* (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). "Under th[e] [*Brecht*] test [for actual prejudice], relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" *Id.* at 2197–98 (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)). Because it is more stringent, the *Brecht* test "subsumes" the AEDPA/*Chapman* standard for review of a state court determination of the harmlessness of a constitutional violation. *Fry v. Pliler*, 551 U.S. 112, 120 (2007). A federal habeas court therefore need not formally apply both the *Brecht* test and the AEDPA standard; it is sufficient to apply *Brecht* alone. *Id.* A determination that the error resulted in "actual prejudice," *Brecht*, 507 U.S. at 637, necessarily means that the state court's harmlessness determination was not merely incorrect, but objectively unreasonable, *Davis*, 135 S. Ct. at 2198–99. A separate AEDPA/*Chapman* determination is not required.

Mays argues that his trial testimony, and his inculpatory statements that could have been used to impeach his trial testimony, should not be part of the harmlessness calculus because he might not have testified had he not been obligated to explain his improperly-admitted statements. In *Harrison v. United States*, the Supreme Court held that when a defendant's out-of-court confession is improperly admitted into evidence at his trial, the defendant's trial testimony may not be used to support defendant's conviction unless the prosecution can show the confession did not induce the testimony. 392 U.S. 219, 220–26 (1968); *see also Lujan v.*

*Garcia*, 734 F.3d 917, 930 (9th Cir. 2013) ("Under the *Harrison* exclusionary rule, when a criminal defendant's trial testimony is induced by the erroneous admission of his out-of-court confession into evidence as part of the government's case-in-chief, that trial testimony cannot be introduced in a subsequent prosecution, nor can it be used to support the initial conviction on harmless error review, because to do so would perpetuate the underlying constitutional error."). The California Court of Appeal concluded Mays "would have testified even had his interrogation statements not been admitted in evidence, because he had to deny the strong independent evidence linking him and his gray sweatshirt to the crime." But it is unclear whether the court placed the burden on the government, as it was required to do under *Harrison*.

We need not resolve this question, however, because the state court's alternative holding that the jury would have convicted Mays even without his inculpatory admissions was not unreasonable within the meaning of AEDPA. We acknowledge that although Mays's statements were not a full confession, they were very inculpatory: Mays admitted to being the person in the gray sweatshirt at the scene of the crime, a fact key to the prosecution's case, because the eyewitnesses identified the person in gray as the shooter.

But as the California Court of Appeal pointed out, there was another piece of critical evidence identifying Mays as the person in gray at the crime scene: Detective Husted's testimony concerning Tamara Schallenberg's audiotaped statements to him. As explained, Detective Husted testified that when he showed the AM/PM photo to Schallenberg—a neighbor who considered Mays like a son—Schallenberg identified Mays as the person in the gray sweatshirt "without

hesitation." *Mays*, 95 Cal. Rptr. 3d at 225. When asked how she knew, "she said she knew because she knows him." *Id.* Although Schallenberg mistakenly believed the gray sweatshirt depicted in the photo to be Mays's "South Pole" sweatshirt, her statements make clear she based her identification not on the sweatshirt but on her personal familiarity with Mays — a familiarity other witnesses lacked. We agree with the California Court of Appeal that, although Schallenberg in her conditional examination "tried to recant the identification when she realized its effect on [Mays], . . . [this] does not diminish the impact of her original statement." Additionally, in both her original statement and in her conditional examination, Schallenberg said Mays told her he was present at the crime scene.

In light of Schallenberg's statements, the California Court of Appeal's harmlessness determination was not objectively unreasonable. We hold, therefore, that under the deferential AEDPA standard of review applicable to this case, Mays is not entitled to relief on his habeas petition.[4]

---

[4] We decline to expand the certificate of appealability to encompass the uncertified issue raised in Mays's opening brief: whether Mays's inculpatory statements to Detective Husted were involuntary because his will was overborne. Like his *Miranda* claims, this claim is subject to harmless error analysis. *See Arizona v. Fulminante*, 499 U.S. 279, 295 (1991). Although reasonable jurists could disagree with the district court's conclusion that the inculpatory statements were not coerced, *see Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003), even if we were to expand the certificate of appealability and decide this question in Mays's favor, we would conclude he is not entitled to relief because the statements did not result in actual prejudice.

## CONCLUSION

The facts of this case are troubling. A 17-year-old with minimal education invoked his right to counsel while being questioned in connection with a murder. Instead of honoring Mays's request as required under *Miranda* and its progeny, the police detective continued his questioning unabated, administered a fake polygraph examination, and presented Mays with fabricated results. Mays went on to make highly incriminating statements that were used against him at trial. But because the state court's harmlessness determination was not objectively unreasonable, we affirm the district court order denying Mays's habeas petition.

**AFFIRMED.**